THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MAURICE BARFIELD, Defendant-Appellant.

First District (3rd Division) No. 1—86—2420

Opinion filed June 28, 1989.—Modified on denial of rehearing
September 13, 1989.

Michael J. Pelletier and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Patricia Y. Brown, and Lauren E. Brown, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WHITE delivered the opinion of the court:

Following a bench trial, defendant, Maurice Barfield, was found guilty of the murder and the attempted armed robbery of Maurice Davis. Defendant was sentenced to 66 years' imprisonment for the murder, and 15 years' imprisonment for the attempted armed robbery, the sentences to run concurrently. Defendant filed a timely appeal and he argues that: (1) he was denied effective representation of counsel; (2) the trial court erred in sentencing him to an extended term of imprisonment for murder; (3) his sentence should be reduced in light of the shorter sentences imposed on his codefendants, Anthony Castile and Lamont Lowe; and (4) the trial court failed to order a presentence investigation report as required by statute. For the reasons stated below, we affirm defendant's conviction and sentence.

A summary of the evidence adduced at trial follows.

Margaret Ann Davis, Maurice Davis' mother, testified that her son was alive on the afternoon of January 30, 1985. She identified his body at the Cook County morgue on January 31, 1985.

Dr. Edmond Donoghue is a forensic pathologist employed by the office of medical examiner of Cook County. On January 31, 1985, he examined the body of Maurice Davis. He observed a gunshot entry wound on the right side of the head, above and in front of the right ear. He also observed a gunshot entry wound on the left side of the head, above and in front of the left ear. He removed skin tissues from both entry wounds and examined the tissues under a microscope. The tissues from the left side entry wound revealed the presence of gunpowder residue. He did not observe any gunpowder residue in the tissues taken from the right side entry wound. Dr. Donoghue testified that in his opinion, Maurice Davis died of multiple gunshot wounds.

On cross-examination, Dr. Donoghue testified that he did not observe any other lacerations, bruises, injuries or evidence of recent trauma on the body.

Ricky Tate testified that, on January 30, 1985, he went to the High Roller Car Wash at 3419 W. Madison in Chicago to apply for a job. Defendant entered the car wash and asked him some questions. Defendant then went to the door of the car wash and talked with La-

mont Lowe and Anthony Castile. Maurice Davis was also standing by the door. Defendant then walked over to the stairs in the car wash and talked with Wilson Shepard, the car wash manager. Defendant picked up his belongings by the stairs and returned to the door. Defendant then told Maurice Davis that he was disrespectful. Davis replied that he respected defendant and asked him not to shoot. At this point, Castile was holding Davis by the left leg, Lowe was holding him by the arm, and defendant was holding his shirt. Davis fell down in a sitting position. Defendant stood over Davis with his arms in front of him and pointed toward the ground, and the gun went off. Defendant then stuck his arm in his jacket and ran out of the car wash. Lowe and Castile went through Davis' pockets and then ran out.

Ricky Tate testified that he drank some beer at approximately 3 p.m. on the afternoon of the incident. He was interviewed by the police after the incident. He told the police what had happened but said that he could not identify the offenders. He did not tell the police that he had seen the offenders nor did he describe the offenders.

On cross-examination, Ricky Tate testified that Janette Conway and Wilson Shepard were upstairs at the time of the shooting. The only other persons on the ground floor of the car wash were defendant, Lowe, Castile, Maurice Davis, and David McDonald. Mr. McDonald was approximately 35 feet away from the area of the shooting.

Janette Conway testified that she was working at the car wash on January 30, 1985. She was talking with Wilson Shepard when defendant, Lowe and Castile entered the car wash. She had known defendant, Lowe and Castile for some time prior to the shooting. Maurice Davis then entered the car wash and attempted to sell some merchandise to Shepard and Conway. Conway then testified that Lowe grabbed Davis by the neck while Castile started going through his pockets. Davis tried to get away, but, instead, fell down. Defendant then pointed a gun at Davis' head, shot him twice, and ran out through the garage door of the car wash. Lowe and Castile searched Davis' pockets and then went out through the side door of the car wash.

Later that evening, Janette Conway was interviewed by the police at the car wash. She told the police that defendant shot Davis. She was then taken to the police station where she told the police that defendant's companions were Lamont Lowe and Dirty Red, Anthony Castile.

Janette Conway testified that she was on the ground floor of the

car wash at the time of the shooting. She followed Wilson Shepard upstairs after the shooting. Ricky Tate followed her upstairs.

Wilson Shepard testified that on January 30, 1985, he was talking with Janette Conway when defendant, Anthony Castile, Lamont Lowe and Twat entered the car wash. Like Ms. Conway, he had known defendant, Castile and Lowe for some time prior to the incident. Maurice Davis then entered the car wash and asked of Conway or Shepard whether either of them wanted to buy some merchandise. When they said no, Davis went to the door at the front of the car wash. Mr. Shepard testified that he then heard Lamont Lowe say, "Come on, Maurice," and Twat say, "I'm going to do that thing and I'm fixing to do it right now." Twat walked to the front door while reaching for his right back pocket. Defendant staggered over to the shoeshine stand and got his jacket. Defendant then followed Lowe to the front door. Anthony Castile had walked up to the front door several minutes earlier. Mr. Shepard then heard a rumble, turned, heard some shots, ran upstairs, and called the police.

On cross-examination, Mr. Shepard testified that defendant was staggering earlier in the evening. Defendant had either been drinking or smoking. Approximately 10 minutes before the shooting, defendant approached him and said "Bigman, he said, I just don't know, he said, I'm so _____ _____ high it feels like I'm floating in the air." Defendant then went to the juke box and lifted his arms like he was floating in the air.

Police officer Robert Grapenthien testified that on January 30, 1985, he responded to a call that a man had been shot at the car wash. He spoke to Janette Conway at the car wash. She identified defendant as the offender. He then proceeded to defendant's apartment at 3407 Monroe Street in Chicago. He located defendant in a bedroom in the apartment and placed him under arrest. Officer Tondryk recovered a gun on the floor of the bedroom.

Officer Grapenthien further testified that defendant made the following statement. Defendant said that Maurice Davis had robbed them earlier that week and that they were going to rob him. Defendant had a gun. Castile, Lowe and Antoinne Stenson, known as Twat, grabbed Davis and hit him. Davis started fighting and they knocked him to the ground. Castile, Lowe and Stenson yelled out "shoot him" and defendant fired twice at Davis.

On cross-examination, Officer Grapenthien testified that his police report does not indicate that defendant told him that Davis had robbed him.

Sergeant Vincent Tondryk testified that on January 30, 1985, he

recovered a Rossi revolver with a cut-off barrel on the floor of defendant's bedroom. The revolver contained two expended rounds and three live rounds of ammunition.

Sergeant Vincent Lomoro testified that he examined a .38 caliber Rossi that was forwarded to the crime laboratory of the Chicago police department. He also examined two bullets that were forwarded to him by the coroner's office. In his opinion, one of the bullets was fired from the .38 caliber Rossi. The second bullet had the same class characteristics as the first bullet. However, due to mutilation and loss of bullet surface, he could not say positively that the second bullet was also fired from the .38 caliber Rossi.

Assistant State's Attorney Catherine Quattrocchi testified that on January 31, 1985, defendant gave her an account of the shooting. Defendant said that on January 30, 1985, he was at the car wash with Antoinne Stenson, Anthony Castile and Lamont Lowe when Maurice Davis entered the car wash. Defendant heard someone say, "There he go, the one who tried to rob us." Lamont Lowe then handed a gun to him and said, "Let me grab [Davis]." Lowe grabbed Davis and "they were tussling." Lowe, Castile and Antoinne Stenson then went through Davis' pockets and bag, threw him down on the floor and said, "Shoot him, man, shoot him." Defendant took the gun out of his pocket, waited for a little while and then shot Davis. He waited a while longer and shot Davis a second time. He then ran home from the car wash and placed the gun behind the dresser in his bedroom.

At the conclusion of the evidence, the trial court found defendant guilty of attempted armed robbery and murder. The trial court then held a death sentencing hearing at which the following testimony was adduced.

Police officer Grapenthien testified that defendant is a member of the Mad Black Souls, a faction of the Black Souls gang. Officer Grapenthien arrested defendant on October 8, 1984, after he observed defendant pull a gun out of his jacket pocket and throw it on the ground. On October 19, 1984, defendant pled guilty to unlawful use of weapons.

Sister Antoinette Burgen, the director of family and neighborhood services at Marillac House, testified for the defense. On October 17, 1983, she hired defendant as an aide at Marillac House. Defendant was employed at Marillac House until the date of his arrest. His employment history at Marillac House was satisfactory. He never had any problems dealing with the clientele of Marillac House.

Defendant testified that on the day of the shooting, he drank some Richard's, some White Port, and some C.C., and smoked PCP

happy sticks. PCP causes him to become violent and makes it difficult for him to tell the difference between right and wrong. Shortly before the shooting, Shepard told him that he should go home and get some sleep because he seemed to be in bad shape.

On cross-examination, defendant testified that he had used happy sticks on previous occasions and that he knew the effects of happy sticks. On the day of the shooting, he shared five happy sticks with several other persons.

At the conclusion of the hearing, the trial court decided that defendant should not be sentenced to death. Instead, the trial court sentenced defendant to a term of imprisonment.

OPINION

INEFFECTIVE ASSISTANCE OF COUNSEL

■■■ We first consider defendant's contention that he was denied the effective assistance of counsel. To obtain a new trial, a defendant who asserts that he was denied the effective assistance of counsel must show both a deficiency in counsel's performance and prejudice resulting from that. (*Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064; *People v. Weir* (1986), 111 Ill. 2d 334, 337, 490 N.E.2d 1.) Counsel's performance is deficient if it falls below an objective standard of reasonableness considering all the circumstances. (*Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065; *Wiley v. Sowders* (6th Cir. 1981), 647 F.2d 642, 648, *cert. denied* (1981), 454 U.S. 1091, 70 L. Ed. 2d 630, 102 S. Ct. 656; *People v. Powell* (1987), 159 Ill. App. 3d 1005, 1014, 512 N.E.2d 1364.) To show actual prejudice resulting from the alleged deficiency in counsel's performance, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

■■ ■ The inquiry into the competency of counsel will not generally extend to the exercise of judgment, discretion, trial tactics or strategy even where appellate counsel or the reviewing court might have handled the matter differently. (*People v. Schmidt* (1988), 168 Ill. App. 3d 873, 882, 522 N.E.2d 1317.) A defendant is entitled to competent, not perfect, representation, and the fact that a tactic in retrospect proved unsuccessful does not demonstrate incompetence. (*Wiley v. Sowders*, 647 F.2d at 648; *People v. Schmidt*, 168 Ill. App. 3d at

882.) Moreover, a defendant may not rely on mere conjecture or speculation that the outcome would have been different with representation of higher caliber. *People v. Schmidt*, 168 Ill. App. 3d at 882; see also *People v. Weir*, 111 Ill. 2d at 339.

■ In a narrow range of cases, a defendant complaining of the ineffective assistance of counsel need not demonstrate that he suffered actual prejudice from counsel's deficient performance. (*Strickland*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Hattery* (1985), 109 Ill. 2d 449, 461, 488 N.E.2d 513, *cert. denied* (1986), 478 U.S. 1013, 92 L. Ed. 2d 727, 106 S. Ct. 3314.) The sixth amendment requires, at a bare minimum, that defense counsel act as a true advocate for the accused. Where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *United States v. Cronic* (1984), 466 U.S. 648, 659, 80 L. Ed. 2d 657, 668, 104 S. Ct. 2039, 2047; *People v. Hattery*, 109 Ill. 2d at 461.

In the case at bar, defendant asserts that counsel failed to act as a true advocate because counsel admitted that defendant was guilty of the murder.[1] Citing *People v. Hattery* (109 Ill. 2d 449, 488 N.E.2d 513), defendant maintains that his claim of ineffective representation falls within the range of cases where prejudice will be presumed.

---

[1]In closing argument, defense counsel told the trial court:

"The Court in this case, unlike the jury, heard all of the evidence and all of the witnesses. I don't think there is any argument in this case about who the shooter was. In every instance each person has said that my client Maurice Barfield fired the fatal shot. I don't think that there is any argument that the gun was recovered from his home.

I think the issue in this case is, however, whether or not Maurice Barfield shot this man to aid in a robbery attempt.
* * *

The version is given and what was put in evidence here that the defendant fired these shots and immediately fled. And immediately fled. The fact that these men went through [the victim's] pockets after he had ran [sic] away might make it a robbery but it certainly won't make it an armed robbery.
* * *

And the circumstantial evidence case that the court is trying to make against this defendant is robbery which the defendant did not participate in. The defendant shot the man and fled. He immediately, that is the testimony of the shy witness Janette Conway, that is the testimony of the late recalling witness Ricky Tate, and that's the *** statement in here from this defendant.

I can only say this to the Court that if the defendant were participating in a robbery, intended to rob somebody, why would he run away as soon as he fired the shots.

In *People v. Hattery*, the defendant was charged with the murder of a woman and her two children. The evidence showed that the defendant stood guard over the victims while a codefendant and the woman's husband were trying to obtain drugs. The defendant confessed to the murders but claimed that the codefendant instructed him to kill the victims if the codefendant did not return within a short period of time. The defendant also claimed that the codefendant threatened to harm him and his family if he disobeyed the order to kill the victims. In the opening statement, defense counsel told the jury that, at the end of its deliberations, it would find the defendant guilty of murder and eligible for the death penalty. Defense counsel then told the jury that the only question would be whether to impose the death penalty on the defendant for trying to save the life of his family. Defense counsel did not present any theory of innocence at trial, did not present any evidence and did not make a closing argument. Rather, defense counsel attempted to show, in cross-examination, that the defendant's actions were the result of compulsion. The defendant was convicted of the murders and sentenced to death. On appeal, the Illinois Supreme Court stated:

"After considering the actions of the defense counsel in the present case we are convinced that the prosecution's case was not subjected to the 'meaningful adversarial testing' required by the sixth amendment. [Citation.] The concession of defendant's guilt by his attorneys was unequivocal. *** The comments by defense counsel during the guilt-innocence phase that the trial was a 'death penalty' case further impressed upon the jury the false notion that the guilt or innocence of the defendant was not at issue but, rather, had already been decided.

Defense counsel's trial strategy—which attempted to show that defendant was guilty of murder but undeserving of the

* * *

But that doesn't make it come out of a robbery because after [defendant] shot the man and ran away someone decided to go in [the victim's] pockets, it doesn't make it a robbery, your Honor. Murder, yes; robbery, no.

And that's the evidence that the State presented to this Court.

* * *

That Mr. Shepard said to the Court that this kid took his jacket down and he asked him something and he said to Mr. Shepard, I'm high, I believe the expression was, a vulgarity as a _____ _____.

Now, Judge, I know that's not the defense to murder and I'm not claiming it as a defense but I do think it's a fact in this case to indicate how such a thing happened, how a person that young could suddenly take another human being's life."

death penalty—was totally at odds with defendant's earlier plea of not guilty. There is no evidence that defendant consented to his attorneys' strategy, and such consent will not be presumed from a silent record." (*People v. Hattery*, 109 Ill. 2d at 464.)

The court concluded that defense counsel's actions deprived the defendant of the right to have the issue of guilt or innocence presented to the jury as an adversarial issue, and the defendant was denied effective assistance of counsel.

We believe that there are important distinctions between the present case and *People v. Hattery*. First, in *People v. Hattery*, defendant was tried by a jury. In the present case, defendant was tried by the court. We believe that a trial court is less likely to be influenced by an admission of guilt. A trial court knows that the matter of guilt or innocence is to be decided by the trier of fact and that the burden is upon the prosecuting attorney to prove guilt beyond a reasonable doubt.

Second, in *People v. Hattery*, the defendant was charged with three counts of murder. The defendant's counsel did not present any defense to the charges and told the jury that the defendant was guilty as charged. In the present case, defendant was charged with attempted armed robbery and murder. Defense counsel admitted that defendant was guilty of the murder but argued vigorously that defendant was not guilty of the attempted armed robbery. Two witnesses identified defendant as the person who killed the victim. In addition, the gun used in the shooting was found in defendant's bedroom shortly after the shooting. Lastly, defendant made a recorded statement in which he admitted that he had killed the victim. The evidence of defendant's guilt on the murder charge was overwhelming. On the other hand, the testimony of several witnesses showed that defendant ran out of the car wash immediately after the shooting and that codefendants Lowe and Castile searched the victim's pockets after defendant left the car wash. Defense counsel argued that defendant could not be found guilty of attempted armed robbery because the testimony did not show that defendant and the codefendants planned the robbery in advance and the attempt by Lowe and Castile to rob the victim occurred after defendant ran from the car wash with the gun.

■■ Defense counsel's goal was to avoid a finding that the murder was committed during the course of the attempted armed robbery. Had counsel been successful in his argument, defendant would not have been eligible for imposition of the death penalty. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1.) In light of these facts, we cannot say that counsel failed to act as a true advocate, nor can we presume that defendant

was prejudiced by counsel's actions. See *People v. Buford* (1988), 178 Ill. App. 3d 329, 533 N.E.2d 472 (where defendant was charged with two counts of intentional murder and one count of felony murder, and defense counsel stated during closing argument that defendant had not intended to shoot the victim, assistance of counsel was effective since accident is a defense to intentional murder although it is not a defense to felony murder); *People v. Gill* (1988), 169 Ill. App. 3d 1049, 523 N.E.2d 1239 (court recognized the legitimacy of admitting guilt to less than all counts in a multicount indictment or less than all elements of the crime(s) charged where evidence of defendant's guilt is overwhelming and counsel's strategy is to win a reduced sentence); *People v. Powell* (1987), 159 Ill. App. 3d 1005 (it was not unreasonable for defense counsel to concede that defendant had shot three people where defendant had not denied the shootings and there was no question regarding defendant's identity, and the only issue was defendant's intentions during the shootings); *People v. Weger* (1987), 154 Ill. App. 3d 706, 506 N.E.2d 1072 (defendant received a true adversarial criminal trial where counsel conceded guilt on the charges of burglary and possession of burglary tools, for which there was overwhelming evidence, but vigorously contested the offense of armed violence).

■ Since we have rejected defendant's contention that his counsel failed to act as a true advocate, we cannot presume that defendant was prejudiced by counsel's actions. It follows that, in order to obtain a new trial, defendant must show that he was actually prejudiced by his counsel's actions. Defendant has failed to make such a showing. The evidence of defendant's guilt was overwhelming. It included testimony of eyewitnesses, defendant's confession, and the murder weapon. In our opinion, there is no reasonable probability that the results of the trial would have been different, without the admission of guilt.

We conclude that defendant has failed to show that he was prejudiced by counsel's actions. Accordingly, defendant is not entitled to a new trial.

EXTENDED-TERM SENTENCE

Next, defendant argues that the trial court erred in sentencing him to an extended term of 66 years' imprisonment for murder. Defendant asserts that the murder was not so heinous and brutal as to justify the imposition of an extended term.

■■ Initially, we note that the imposition of a sentence is a matter involving considerable judicial discretion (*People v. La Pointe* (1981), 88 Ill. 2d 482, 492, 431 N.E.2d 344; *People v. Barkauskas*

(1986), 147 Ill. App. 3d 360, 373, 497 N.E.2d 1183), and, where the sentence imposed is within the statutory limits, a reviewing court will not exercise its power to reduce the sentence absent a finding that the trial court abused its discretion. (*People v. Cabrera* (1987), 116 Ill. 2d 474, 494, 508 N.E.2d 708, *cert. denied* (1987), 484 U.S. 929, 98 L. Ed. 2d 257, 108 S. Ct. 297; *People v. Smith* (1988), 172 Ill. App. 3d 94, 112, 526 N.E.2d 849.) It is generally recognized that the trial court is in a superior position during the trial and the hearing in aggravation and mitigation to make a sound determination as to the punishment to be imposed than are courts of review. *People v. Cabrera*, 116 Ill. 2d at 494.

Section 5—5—3.2 of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2) provides that a trial court may impose an extended-term sentence when a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. Conduct is "heinous" if it is hatefully or shockingly evil, grossly bad, enormously and flagrantly criminal. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 501, 431 N.E.2d 344; *People v. Nester* (1984), 123 Ill. App. 3d 501, 504, 462 N.E.2d 1011.) "Brutal" includes conduct which is grossly ruthless, devoid of mercy or compassion, or cruel and cold-blooded. (*People v. La Pointe*, 88 Ill. 2d at 501.) A showing that torture or unnecessary pain was inflicted upon the victim is not a prerequisite to finding that the defendant's behavior was brutal or heinous. (*People v. La Pointe*, 88 Ill. at 501; *People v. Hickman* (1986), 143 Ill. App. 3d 195, 205, 492 N.E.2d 1041.) A single act which causes death or injury may be sufficient to demonstrate the existence of wanton cruelty. *People v. Hickman*, 143 Ill. App. 3d at 205; *People v. Nester*, 123 Ill. App. 3d at 506.

In the present case, the evidence at trial showed that defendant, Lamont Lowe and Anthony Castile planned to rob the victim. When the victim entered the car wash, Lamont Lowe said "[C]ome on Maurice," and "[L]et me grab him." Lamont Lowe then handed a gun to defendant. Twat, defendants' companion, said "I'm going to do that thing and I'm fixing to do it right now." Defendant followed Lowe to the front door, where the victim was standing. Lowe held the victim by the arm, Castile held the victim by the leg and defendant grabbed the victim by the front of his shirt. The victim was thrown to the floor. Defendant's companions said "[S]hoot him, man, shoot him." Defendant took the gun out of his pocket, waited for a little while and shot the victim in the head. He waited a while longer and shot the victim in the head a second time. One of the bullets left gunpowder residue on

the victim's skin, an indication that the gun was fired at close range. Defendant then ran from the car wash.

Defendant's conduct demonstrates a cold-blooded attack upon a person who was on the ground and defenseless. Moreover, it has been held that a defendant's subsequent demonstration of remorse for his conduct or a lack of a penitent spirit is an important factor in determining whether his conduct is indicative of wanton cruelty. (*People v. Hickman*, 142 Ill. App. 3d at 206; *People v. Nester*, 123 Ill. App. 3d at 506.) We have not found any evidence in the record that defendant exhibited remorse for his conduct. To the contrary, defendant ran from the car wash and made no attempt to help the victim. Defendant went home and attempted to hide the murder weapon. Based upon the record in this case, we cannot say that the trial court abused its discretion when it found that defendant's conduct was indicative of wanton cruelty. See *People v. La Pointe*, 88 Ill. 2d 482 (defendant planned to rob a taxi driver, shot the driver twice in the back of the head, took the driver's money and fled); *People v. Nester*, 123 Ill. App. 3d 501 (a cold-blooded attack upon a person who had already been beaten in a fight was indicative of wanton cruelty).

Defendant maintains that he was under the influence of drugs and alcohol on the day of the shooting, and, consequently, the trial court erred in finding that his conduct was indicative of wanton cruelty. Although Wilson Shepard's testimony at trial and defendant's testimony at the sentencing hearing provide some support for defendant's claim that he was under the influence of drugs on the day of the shooting, other evidence in the record supports the inference that defendant was not incapacitated by his alleged use of drugs. We note that although defendant testified that he smoked PCP happy sticks on the day of the shooting, defendant nowhere testified that he was either intoxicated or drugged at the time of the shooting. Nor did defendant testify that, at the time of the shooting, he could not tell the difference between right and wrong. Moreover, defendant testified that he shared the PCP happy sticks with several other persons, and that he was able to unwrap the PCP happy sticks from the aluminum foil in which they were contained and light them.

Shortly after the shooting, defendant made a statement to police officer Grapenthien in which he admitted having planned to rob the victim and shooting the victim. Several hours after the shooting, defendant gave a detailed statement to State's Attorney Quattrocchi and corrected several mistakes in the transcript of the statement. Furthermore, the presentence investigation report filed in the trial court indicates that defendant was able to stop using drugs, as well as alco-

hol, sometime in 1984. The shooting occurred in January 1985. These facts indicate that defendant had not used any drugs on the night of the shooting or was not incapacitated by his use of drugs and alcohol. We conclude that the trial court's findings that defendant was aware of his actions and that his conduct was indicative of wanton cruelty were not against the manifest weight of the evidence.

DISPARATE SENTENCES

 Defendant argues that his sentence must be reduced in light of lesser sentences imposed on codefendants Lamont Lowe and Anthony Castile. We disagree. Although an arbitrary and unreasonable disparity between the sentences of codefendants is impermissible, the mere fact that one defendant receives a substantially longer sentence than another does not, by itself, establish a violation of fundamental fairness. (*People v. Kline* (1982), 92 Ill. 2d 490, 508, 442 N.E.2d 154.) A disparity between sentences may be supported by either a more serious criminal record or greater participation in the offense. *People v. Godinez* (1982), 91 Ill. 2d 47, 55, 434 N.E.2d 1121; *People v. Treece* (1987), 159 Ill. App. 3d 397, 418, 511 N.E.2d 1361; *People v. Martin* (1980), 81 Ill. App. 3d 238, 245, 401 N.E.2d 13.

Judge Gillis of the circuit court presided over defendant's bench trial, and sentenced defendant to 66 years' imprisonment for murder. Judge Gillis also presided over the jury trial and sentencing hearing of codefendants Lamont Lowe and Anthony Castile. He sentenced Lamont Lowe to 25 years' imprisonment for murder. Anthony Castile received a sentence of 22 years' imprisonment for murder. In imposing sentence over Lowe and Castile, Judge Gillis observed:

> "The facts in this case were aggravated. As I indicated in the sentencing of Maurice Barfield, it was Maurice Barfield that did the heinous and brutal acts that killed maurice Davis. It may have been the joint plan, may have been the idea of Lamont Lowe to start this robbery or commit this robbery, but I cannot jump to the conclusion that the murder of Maurice Davis was a part of that. There's no evidence of that and I cannot jump to the conclusion that every person who plans to commit a robbery plans to commit a murder or in this case, plans to commit a heinous brutal murder.
>
> ***
>
> I want to emphasize again that the defendants, not Lamont Lowe and not Maurice Barfield—excuse me. Not Lamont Lowe and not Anthony Castile, neither of those men took a gun and shot the victim in this case. They were part of a robbery Mr.

Lowe may have started. Initiated the robbery. They did not pull the trigger. They did not kill. They did continue to rob the dead or dying man. That's a proper factor to be considered in aggravation and I have considered that. Shows a callousness one would hope not to see and experience and that standard is in the record, for what it is."

Thus, it is clear that Judge Gillis belived that Lowe and Castile should receive lesser sentences because of their lesser participation in the murder.

 The record shows that defendant approached the victim, held him by the shirt and told him that "he was disrespectful." The victim replied that "he respected" defendant and asked defendant not to shoot. Castile held the victim by the left leg and Lowe held the victim by the arm. The victim fell to the floor. Defendant stood over the victim with his arms pointed toward the ground and shot the victim once on the right side of the head and once on the left side of the head. It is recognized that a court of review, in considering the appropriateness of punishment, must give great weight to the judgment of the trial court. (*People v. Godinez*, 91 Ill. 2d at 55.) The trial court's decision may not be altered absent an abuse of discretion. (*People v. Moon* (1982), 107 Ill. App. 3d 568, 575, 437 N.E.2d 823; *People v. Johnson* (1978), 59 Ill. App. 3d 640, 642, 375 N.E.2d 1027.) Upon this record, we cannot say that Judge Gillis abused his discretion in sentencing defendant to a longer term of imprisonment than Lowe and Castile. See *People v. Godinez*, 91 Ill. 2d 47, 434 N.E.2d 1121 (disparity in sentences was justified where defendant entered the food store first, commanded the victims, and emptied the cash registers); *People v. Treece*, 159 Ill. App. 3d at 418-19 (disparity in sentences was justified where defendant took the victim from her home, at gunpoint, and fired the gun, killing the victim); *People v. Ganter* (1977), 56 Ill. App. 3d 316, 327-28, 371 N.E.2d 1072 (disparity in sentences was justified where defendant announced a stickup and shot the victim twice while the victim was in a helpless position).

PRESENTENCE INVESTIGATION REPORT

A presentence investigation report was filed with the trial court on June 10, 1985. Defendant was sentenced on August 18, 1986. The trial court did not order a new presentence investigation report for use at the sentencing hearing. Defendant argues that the trial court erred in failing to order a new presentence investigation report and asks that we remand for a new sentencing hearing. We refuse to do so.

 Defendant failed to object to the use of the 1985 presentence

report at the sentencing hearing. Defendant also failed to raise this issue in a motion for a new trial. It is the duty of defendant to bring to the attention of the trial court any alleged deficiency or inaccuracy in the presentence report. (*People v. Meeks* (1980), 81 Ill. 2d 524, 533, 411 N.E.2d 9; *People v. Moore* (1987), 159 Ill. App. 3d 1070, 1075, 513 N.E.2d 87; *People v. Gornick* (1982), 107 Ill. App. 3d 505, 515, 437 N.E.2d 892.) Accordingly, defendant has waived any purported deficiency in the presentence report with respect to its lack of current information. *People v. Moore*, 159 Ill. App. 3d at 1075 (absent an objection or a request for a supplemental report, the defense contention that the report lacked sufficiently current information is waived); *People v. Gornick*, 107 Ill. App. 3d at 515; *People v. Chaney* (1977), 48 Ill. App. 3d 775, 792, 362 N.E.2d 1375.

For the aforementioned reasons, defendant's conviction and sentence are affirmed.

Affirmed.

FREEMAN, P.J., and McNAMARA, J.,* concur.

---

*Justice McNamara participated in this appeal prior to his assignment to the sixth division.